

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KEITH KIER,                                  :
                                             :     CIVIL ACTION
          Plaintiff,               :
                                             :
  v.                                        :
                                             :     NO.  14-897
F. LACKLAND & SONS, LLC d/b/a                :
LACKLAND SELF STORAGE; and                   :
STORAGE ASSETS, LLC,                         :
                                             :
          Defendants.              :



### MEMORANDUM

RONALD L. BUCKWALTER, S.J.                              December 17, 2014

      Currently pending before the Court is the Motion for Summary Judgment by Defendants

F. Lackland & Sons LLC and Storage Assets LLC (collectively "Defendants").  For the following

reasons, the Motion is granted.

## I.     FACTUAL BACKGROUND

### A.     General Information About the Parties

      Lackland Self Storage ("Lackland") operated a facility located in King of Prussia,

Pennsylvania that leased storage units and rented U-Haul vehicles.  (Defs.' Mot. Summ. J., Ex.

B, Dep. of Jose Falero ("Falero Dep.") 17:19–18:13, Aug.  25, 2014.)  Plaintiff was hired on July

15, 2011 as a yard person at Lackland's King of Prussia facility.  (Defs.' Mot. Summ. J., Ex. A.,

Dep. of Keith Kier ("Kier Dep."), 9:3–7, 15:18–20 Aug. 25, 2014.)  In that capacity, he was in

charge of overall maintenance and cleaning of the facility.  (Id. at 11:99–19.)  His official

employer was Defendant Storage Assets LLC ("Storage Assets").  (Kier Dep. 9:8–11; Defs.'

Mot. Summ J., Ex. C, Dep. of Kelly Antos ("Antos Dep."), 17:19–24, Aug. 27, 2014.)



Defendant F. Lackland & Sons LLC has no relationship to Plaintiff's employment or the King of Prussia facility. (Antos Dep. 18:21–19:6.)

Over the course of his employment, which lasted from July 15, 2011 to March 14, 2013, Plaintiff worked twenty hours a week. (Kier Dep. 15:12–17.) Only three employees worked in the King of Prussia location during Plaintiff's tenure with Storage Assets: (1) Gabrielle Carey, the Store Manager from July 2011 to February 4, 2013, and Bill Gulini, the Store Manager from February 4, 2013 onward; (2) the Assistant Manager Jose Falero and (3) Plaintiff, who worked as the yard person. (Kier Dep. 22:5–23:6, 165:23–166:2; Defs.' Mot. Summ. J., Ex. D, Dep. of William Gulini ("Gulini Dep.") 13:2–15:2, Aug. 27, 2014.)

### B.   Plaintiff's Confrontation With A Customer

On February 23, 2013, Plaintiff had a problematic interaction with a customer. (Kier Dep. 89:2–8.) According to Plaintiff's description, Jose Falero was taking care of a customer in the front and Plaintiff was in the back area. (Id. at 89:10-12.) A customer came in and said that the was getting his car that had been in storage for a few months. (Id. at 89:12–15.) The customer apparently became agitated because the charge Falero had originally quoted was lower than would it actually cost to get it out, and Plaintiff decided to interject himself. (Id. at 89:15–21.) Some discussion began over the seats in the customer's car and the customer accused Plaintiff of stealing his car seats, at which point Plaintiff told the customer he should apologize. (Id. at 90:8–13.) After some additional back and forth between the customer and both Falero and Plaintiff about the price, Plaintiff called him a "f***ing drunk." (Id. at 90:15–21.) Plaintiff didn't want the situation to go any further, so he walked out the back door to allow things to cool down. (Id. at 91:1–5.) Another customer, Kenneth Green, witnessed this interaction while he

was there returning a truck. (Defs.' Mot. Summ. J., Ex. G, Dep. of Kenneth Green ("Green Dep."), 8:24–9:12, June 17, 2014.) Mr. Green recalled Plaintiff telling the customer "f**k you" and calling him a drunk, and stated that the customer was not engaging with Plaintiff. (Id. at 19:20–21:17.) Green did not detect any alcohol on the customer's breath. (Id.)

That same day, Gulini received either a voicemail or a text message from Jose Falero indicating that there was a "slight altercation" between a customer and Plaintiff. (Gulini Dep. 25:10–26:2.) Falero could not recall whether he specifically told Gulini that Plaintiff told the customer to "go f*** himself," but simply remembers explaining to him what occurred that night and that there had been a yelling altercation. (Falero Dep. 27:17–30:9.) Prior to receiving that message, Gulini already had some concerns about Plaintiff since his performance on the job was not to the standard that he expected. (Gulini Dep. 26:3–23.) Subsequently, Plaintiff approached Gulini on his own to describe the incident and told Gulini the customer was drunk, cursing, out of control, and carrying on in the office area. (Kier Dep. 80:19–86:8.)

### C.   Discovery and Investigation of Customer Complaint

Gulini would periodically check the U-Haul website or reviews of Storage Assets or Lackland. (Gulini Dep. 36:3–22.) In the course of doing so, on March 12, 2013, Gulini discovered a review by Kenneth Green, the customer who witnessed Plaintiff's altercation with the other customer, wherein he indicated that Plaintiff had used profanity and called the other customer a drunk. (Id. at 34:15–36:6, 38:10–40:6.) The review stated:

> At the counter[,] one of your employee's started using profanity towards the customer a head of me. Words included f**k you, you're a drunk. This poor guy paid his bill and did not return the insults. I'm 55 and NEVER witnessed a retail transaction that included an employee verbal [sic] abusing a customer. Shame on you U-Haul. I would end this partnership in a NY min. No I will NEVER use U haul. If you want

3

more feedback contact me. I would be happy to share this with any corporate person.

(Defs.' Mot. Summ. J., Ex. H.)  Notably, Gulini testified that when Falero first reported the

incident, he did not tell Gulini that Plaintiff had used profanity or called the customer a drunk.

(Gulini Dep. 62:14–21.)  Gulini believed that use of profanity towards a customer warranted

termination.  (Id. at 40:2–16.)

     Upon discovering this review, Gulini contacted his supervisor, Operations Manager

Manny Zamora, to notify him about his findings.  (Gulini Dep. 41:7–11; Defs.' Mot. Summ. J.,

Ex. E., Dep. of Manny Zamora ("Zamora Dep.") 21:8–22:12, Aug. 27, 2014.)  Gulini also asked

Falero to prepare an incident report about the events.  (Gulini Dep. 52:5–8.)  This report stated as

follows:

> On 2/23/13 at around 5:40 pm Mr. James Hanley, who was at the time renting
> parking spot 609 came in to discuss the account status and balance of his parking
> spot. He wanted to pay for the storage unit in order to vacate the space as he had sold
> the vehicle.

> While discussing the account with Mr. Hanley, Keith our yardman told the customer
> that there was a tenant who had "custom made white sits [sic] that would fit his
> Chevy Nova vehicle" and that if he was interested to contact the tenant.

> Mr. Hanley told Keith "I already have sits in the car, unless you guys stole them" in
> a joking/sarcastic matter. [sic]  At that moment another customer walked in to return
> a U-haul truck rented earlier in the morning Mr. Kenneth Green. He witnessed the
> argument between Keith and Mr. Hanley, Keith took offense and told the customer
> "Hold up, what did you say?  Why would you say something like that?" as he
> continued to mop the kitchen room. Then an argument ensued as the customer told
> Keith that he was joking and Keith told the customer to pay his "F...ing bill, you're
> a drunk". Keith walked out of the office and the customer told Keith "I don't deserve
> to be talked to that way, I will have your job" and Keith replied "Do what you need
> to do". I apologized to the customer and give him the Customer Service number as
> he was asking for it.

> Also Mr. Kenneth [Green] was getting agitated about what just happened and said
> to me "What is wrong with him, treating customers like that". I told Mr. Kenneth,

that I will help him once the situation calms down and apologized to him and Mr. Hanley. Mr. Hanley paid for his storage unit and he told me he would pick up the receipt the next morning. Mr. Hanley came in on 2/25/2013 and picked up receipt from the payment.

After closing the office I called Bill around 6:40 pm and explained to him about the verbal altercation between Keith and Mr. Kenneth.

(Defs.' Mot. Summ. J., Ex. I.)

Zamora believed that this was "an issue" and drove down to the King of Prussia facility to speak with both Gulini and Falero about the events. (Zamora Dep. 24:8–17.) After Gulini left the room, Falero separately described the incident to Zamora in Spanish, indicating that Plaintiff "just exploded" and started screaming at the customer even though the customer was not even speaking to Plaintiff. (25:1–27:24.) After that conversation, Zamora spoke with someone in the outsourced Human Resources department of Storage Assets—Compensation Solutions—because he believed this to be "gross conduct," and Human Resources indicated that this was grounds for termination. (Id. at 30:7–31:10.)

Based on Plaintiff's conduct, Zamora made the decision to terminate Plaintiff. (Id. at 34:3–8.) Zamora explained that reviews and customers are important, especially at this store that was struggling, and a review like that could have hurt the store "big time." (Id. 39:13–23.) He went on to indicate that they take complaints from customers very seriously and although he tried to contact Mr. Green many times to apologize, Green never answered. (Id. at 40:2–7.) Zamora remarked, "you can't speak to a customer like that no matter how wrong this customer is. You can't talk to customers like that." (Id. at 40:8–10.) Indeed, according to the Lackland Self Storage Employee Handbook, "While engaging in Lackland business, all employees are expected to conduct themselves in a professional manner. This includes being courteous and respectful to

5

everyone the employee comes into contact with, including clients, vendors, and colleagues."
(Defs.' Mot. Summ. J., Ex. J.)  Plaintiff did not dispute that he called the customer a "f***ing
drunk." (Kier Dep. 201:15–22.)

### D.      Plaintiff's Termination

On March 14, 2013, Gulini approached Plaintiff and told him that he was going to have to
let him go because of the incident with the customer, and that he needed his key back.  (Id. at
86:22–87:8.)  Plaintiff was somewhat shocked since he was getting fired so far after the incident,
but Gulini explained that he had just learned about the full incident from a customer complaint.
(Id. at 87:10–24.)  According to the Separation Notice, Plaintiff was terminated for "Profanity &
verbal abuse towards a customer," with a remark that "Keith's behavior towards a customer is
unprofessional and does not meet the standards of the company."  (Defs.' Mot. Summ. J., Ex. K.)
After Plaintiff's termination, Gulini and Falero initially took over Plaintiff's responsibilities until
the cleaning job duties were outsourced to Jani-King, Incorporated; Plaintiff was not replaced.
(Falero Dep. 45:3–20.)

### E.      Plaintiff's Allegations of Disparate Treatment

Plaintiff alleges that he was subjected to disparate treatment by his supervisor, William
Gulini, due to his race.  First, Plaintiff explained that, on two occasions, "[Gulini] would say like,
oh, you are here.  I should have locked the door.  If you were coming, I would have locked the
door, you know, weird statements like that.  He would laugh.  Sometimes Jose—but he would
laugh and say I should have locked the door when I would come in with a good morning or how
are you doing, and I should have locked the door."  (Kier Dep. 37:5–13.)  When asked if he
understood Gulini to be joking, Plaintiff stated that he did not take it as a joke, but rather as

6

Gulini not wanting him to be there, even though the door was never locked.  (Id. at 37:14–23.)

On another occasion, the date of which Plaintiff could not recall, Plaintiff said that Gulini said that Plaintiff made him feel "uncomfortable."  (Id. at 38:13–15.)  Plaintiff could not recall what Gulini said to him or what was happening at the time, other than Plaintiff entering the office area where Gulini was working on a computer  (Id. at 38:13–43:17.)

In addition, shortly after Gulini was hired on February 11, 2013, Gulini made Plaintiff keep a daily log of his tasks.  (Id. at 164:22–165:2.)  Specifically, Plaintiff had to start keeping track of his daily tasks, even though no other employees were required to keep a log.  (Id. at 165:4–166:5, 229:6–12.)  Gulini admitted that he required Plaintiff and not Falero to keep a log. (Gulini Dep. 23:8–24:3.)  He explained, however, that the two men were in different positions, that because Plaintiff was working only twenty hours per week, Gulini did not have a lot of time with him, and that, in lieu of micromanaging, he allowed Plaintiff to keep a log to keep track of what exactly he was doing throughout the day.  (Id. at 24:4–17.)  Plaintiff never expressed any concern to Gulini about having to keep the log.  (Id. at 24:18–22.)

Finally, Plaintiff complained that Gulini lacked enthusiasm to train him.  (Id. at 227:7–18.)  He explained that Gulini seemed very half-hearted with respect to Plaintiff.  (Id. at 227:21–228:8.)  Indeed, even though Gulini seemed to have problems with Plaintiff's performance, Falero, who was an indirect supervisor for Plaintiff, did not.  (Falero Dep. 22:14–23:23.)

F.     **Plaintiff's Allegation of Protected Activity**

As noted above, the customer incident with Plaintiff occurred on February 23, 2013, and he was terminated on March 14, 2013.  Approximately one week prior to his termination,

7

however, Plaintiff claims that he engaged in protected activity.  Plaintiff heard a "ruckus" and "yelling" inside the office and walked in to find an agitated-looking Gulini, Falero, and the back of a customer, who was black. (Kier Dep. 46:6–47:21.)  Plaintiff heard Gulini instruct Falero to call the police, after which Gulini told Plaintiff to watch the customer and follow him to his unit, making some reference to stealing. (Id. at 49:1–50:12.)  Plaintiff then got in the golf cart, went to the unit referenced by Gulini, and looked around for the customer, but did not see him. (Id. at 50:16–54:18.)  Plaintiff then returned to the office, got Gulini, and together they drove around in the golf cart again. (Id. at 54:20–55:3.)  At that point, Gulini explained to Plaintiff that he had a customer, who happened to be black, that lost his key and needed Gulini to cut his lock. (Id. at 58:14–17.)  According to Plaintiff, that was normally done as a courtesy for customers, but Gulini was going to charge him for it and things got a little heated. (Id. at 58:17–23.)

At that point, Plaintiff began thinking that the company had treated other customers a lot better and cutting a lock was a minor thing to diffuse a situation. (Id. at 60:5–9.)  So, Plaintiff said to Gulini, "you know, you are getting all out of hand because this is a black guy, man." (Id. at 60:9–11.)  Gulini said nothing in response. (Id. at 60:15–24.)  They then returned to the office, the police never came, Plaintiff never saw the customer again, and Plaintiff did not discuss the incident with either Gulini or Falero again. (Id. at 61:1–18.)  After this incident, Plaintiff claimed that things between him and Gulini were "tight." (Id. at 80:9–18.)  Plaintiff admits, however, that after this incident, Gulini did not treat him with any disrespect. (Id. at 95:8–11.)  A week later, Plaintiff was terminated. (Id. at 81:3–22.)  Gulini denies that Plaintiff ever complained to him in any way about Gulini's treatment of a customer or suggested that he mistreated a customer due to race. (Gulini Dep. 22:24–23:7.)  Likewise, Falero denies ever

8

hearing Plaintiff accuse Gulini of race discrimination.  (Falero Dep. 15:20–24, 42:18–43:4.)

### G.    Procedural History

Plaintiff initiated the current litigation on February 11, 2014, and filed a First Amended

Complaint on April 16, 2014.  Plaintiff now has three causes of action as follows: (1) wrongful

termination based on race and in retaliation for protected activity in violation of Title VII; (2)

wrongful termination based on race and in retaliation for protected activity in violation of the

Pennsylvania Human Relations Act; and (3) wrongful termination based on race and in

retaliation for protected activity in violation of 42 U.S.C. § 1981.

Defendants filed the present Motion for Summary Judgment on September 22, 2014.

Plaintiff responded on September 29, 2014, Defendants filed a Reply Brief on October 6, 2014,

and Plaintiff submitted a Sur-reply Brief on October 7, 2014.  The Motion is now ripe for judicial

consideration.

### II.    STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on

file, and any affidavits show that there is no genuine issue as to any material fact and that the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2).  A factual dispute is

"material" only if it might affect the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477

U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to

return a verdict in favor of the non-moving party.  Id.

On summary judgment, the moving party has the initial burden of identifying evidence

that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv.

Elec. & Gas Co., 364 F.3d 135, 145–46 (3d Cir. 2004).  It is not the court's role to weigh the

disputed evidence and decide which is more probative, or to make credibility determinations. Boyle v. Cnty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermkts., Inc. v. Darling-Del. Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993)).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).

Although the moving party must establish an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving party's claims." Id. at 325.  If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322.  Moreover, the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50.

## III.   DISCUSSION

Defendants move for summary judgment on Plaintiff's claims of racial discrimination and his claims for retaliation.  The Court discusses each theory of liability separately.

A.      **Race Discrimination Under Title VII, Section 1981, and the PHRA**[1]

Title VII of the Civil Rights Act of 1964 provides in relevant part that it is an "unlawful employment practice for an employer to . . . discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. . . ." 42 U.S.C. § 2000e-2(a)(1).  To establish a claim of discrimination based on disparate treatment, a plaintiff must show that an employer had a racially discriminatory animus against an employee, and that the animus resulted in a challenged action, such as dismissal, failure to promote, or failure to hire.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 914 (3d Cir. 1983).

In McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the United States Supreme Court set forth the precise framework for analyzing a claim based upon racial discrimination where, as here, there is no direct evidence of discrimination.  First, the plaintiff must prove by a preponderance of evidence a prima facie case of discrimination.  McDonnell Douglas, 411 U.S. at 802.  Next, if the plaintiff establishes a prima facie case of discrimination, a "presumption" of discrimination is created and the burden of production shifts to the defendant to articulate some legitimate nondiscriminatory reason for the adverse employment action.  Id. at 802–03.  To sustain this burden, "[t]he defendant need not persuade the court that it was actually motivated by

---

[1] The analysis required for adjudicating Plaintiff's Title VII and PHRA claims is identical.  See Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 317, n.3 (3d Cir. 2000). Similarly, the legal elements and burdens of proof for alleged violations of Title VII and Section 1981 are identical.  Lewis v. Univ. of Pittsburgh, 725 F.2d 910, 915 n. 5 (3d Cir. 1983) (stating "actions brought under § 1981 . . . require the same elements of proof as a Title VII action").  Accordingly, the Court addresses all three claims jointly.

the proffered reasons." Texas Dept. of Cmty. Affairs v. Burdine 450 U.S. 248, 254 (1981).  The

inquiry concerning whether the defendant has met its burden of production "can involve no

credibility assessment," since "the burden-of-production determination necessarily *precedes* the

credibility-assessment stage." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993)

(emphasis in original).  The defendant satisfies its burden of production, and rebuts the plaintiff's

prima facie showing of discrimination, simply by introducing admissible evidence that, if taken

as true, would permit a finding that the challenged employment action was taken for legitimate,

nondiscriminatory reasons.  Id.

      Finally, if the employer meets its burden of production, the presumption of discrimination

created by plaintiff's prima facie case "drops out of the picture."  Id. at 511 (citing McDonnell

Douglas).  In order to establish that the defendant is liable for illegal employment discrimination,

the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real

reason for the adverse employment action at issue.  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir.

1994).  "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered

reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the

plaintiff's contention that the action was taken on the basis of an impermissible discriminatory

criterion." Mitchell v. Miller, 884 F. Supp. 2d 334, 370–71 (W.D. Pa. 2012) (emphasis in

original) (citing St. Mary's Honor Ctr., 509 U.S. at 519 ("It is not enough, in other words, to

*disbelieve* the employer; the factfinder must *believe* the plaintiff's explanation of intentional

discrimination.") (emphasis in original)).  "Nevertheless, evidence suggesting that an employer's

proffered reasons for an adverse employment action are false, when coupled with a plaintiff's

prima facie case, may sufficiently undermine the employer's credibility to enable a reasonable

trier of fact to conclude that illegal discrimination has occurred." Mitchell, 884 F. Supp. 2d at 371 (citing Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147–48 (2000)).

In the case at bar, Plaintiff has no direct evidence of discrimination.  As such, the Court must apply the McDonnell Douglas burden-shifting analysis.  Defendants assert that, under this analysis, Plaintiff's claim fails in two respects.  First, they contend that Plaintiff cannot establish his prima facie case.  Moreover, they argue that, even assuming the existence of the prima facie case, the claim fails because Plaintiff cannot show that Defendants' articulated reason for terminating his employment was a pretext for engaging in race discrimination.  The Court examines each argument individually.

### 1.    Prima Facie Case

A plaintiff must first establish a prima facie case of race discrimination by showing that: (1) s/he is a member of a protected class; (2) s/he was qualified for the position s/he sought to attain or retain; (3) s/he suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.  Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008); see also Kimble v. Morgan Props., 241 F. App'x 895, 897–98 (3d Cir. 2007).  Because the prima facie inquiry in any case is fact-specific, "[t]he touchstone of the inquiry is whether the circumstances giving rise to an inference of discrimination are of *evidentiary value,* not whether they fit into a mechanical formula."  Cobetto v. Wyeth Pharms., 619 F. Supp. 2d 142, 153 n.3 (W.D. Pa. 2007) (emphasis in original).

Defendants do not dispute the first three elements of the prima facie claim, as Plaintiff is African-American, he was qualified for the position of yard worker, and his termination was an adverse employment action.  Defendants, however, argue that Plaintiff cannot demonstrate the

13

fourth element because he has not identified any conduct that can arguably give rise to an inference of discrimination. A plaintiff may demonstrate the circumstantial inference of discrimination in many ways, but must produce "'evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion. . . .'" Pivirotto v. Innovative Sys., Inc., 191 F.3d 344, 355 (3d Cir. 1999) (quoting O'Connor v. Consolidated Coin Caterers Corp., 517 U.S. 308, 312 (1996)) (alterations in original). Showing that similarly situated non-members of the protected class were treated less favorably is one of a variety of methods to create an inference of discrimination. Matczak v. Frankford Candy & Chocolate Co., 136 F.3d 933, 939 (3d Cir. 1997) (citing Olson v. Gen. Elec. Astrospace, 101 F.3d 947 (3d Cir. 1996) ("favorable treatment outside the protected class is an 'alternative' element to a prima facie case . . .")). "The 'central focus' of the prima facie case 'is always whether the employer is treating some people less favorably than others because of their race. . . .'" Sarullo v. U.S. Postal Serv., 352 F.3d 789, 798 (3d Cir. 2003) (quoting Pivirotto, 191 F.3d at 352).

In the present case, Plaintiff simply has not adduced any evidence sufficient to raise an inference of race-based discrimination. First, Plaintiff alleges that Gulini made comments to Plaintiff that he perceived as discriminatory. As detailed above, however, the comments consist of: (1) two occasions of Gulini telling Plaintiff he would have locked the door if he knew Plaintiff was coming; and (2) one occasion of Gulini saying that Plaintiff made him feel uncomfortable after Plaintiff surprised him in the office. While Plaintiff may have, rightly or wrongly, been offended by such comments, nothing in such comments suggests an racial animus. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (noting that "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone amount to

14

discrimination).  Moreover, Plaintiff's mere subjective belief that the comments were

discriminatory, without any objective foundation on which to rest that belief, is insufficient to

establish racial animus.  "An inference of race-based discrimination cannot arise simply from an

employee's subjective belief that his or her race somehow influenced the challenged employment

action."  Howard v. Blalock Elec. Serv., Inc., 742 F. Supp. 2d 681, 702 (W.D. Pa. 2010); see also

Tillman v. Redevelopment Auth., No. Civ.A.12-1505, 2013 WL 5594701, at *8 (E.D. Pa. Oct.

11, 2013) ("A plaintiff's own unsubstantiated, subjective beliefs of suspicions alone would not

suffice to persuade a rational trier of fact that age [or race] was a factor in the termination

decision.").

Second, Plaintiff alleges that Gulini made Plaintiff keep a log of his work, was reluctant

to train Plaintiff, and was the only supervisor who seemed to be dissatisfied with Plaintiff's

work.  Plaintiff, however, has not—and cannot—establish that he was treated less favorably than

a similarly-situated employee outside his protected class.  As explained above, the King of

Prussia location of Storage Assets had only three employees: (1) William Gulini, the Manager,

who was Caucasian; (2) Jose Falero, the Assistant Manager, who was Hispanic; and (3) Plaintiff,

the yard worker, who was African-American.  As to the log, Gulini explained as follows:

> He [Plaintiff] only was working 20 hours a week.  So I had limited time with him.
> And, because I wasn't 100 percent sure as to what he did throughout the day, I
> didn't want to micromanage him.  I wanted to give him some autonomy to be able
> to tell me what he does throughout the day.  So then, from there, I could develop a
> plan to make sure everything was getting done in a timely manner and that I had
> an idea that, while he was working there, if I wasn't there on one particular day,
> he was being productive and getting his work done.

(Gulini Dep. 24:4–17.)  Gulini already had some concerns about Plaintiff's performance based on

the fact that, on Gulini's first day at the store, Plaintiff was sitting in the back room sleeping, and,

15

on more than one occasion, Gulini asked him to clean the storage unit doors inside the building and Plaintiff never started that.  (Id. at 26:9–16.)  Gulini did not require Assistant Manager Falero to keep a log because "they [were] in different positions."  (Id. at 23:15-18.)  Falero confirmed that Gulini only had Plaintiff keep a log to ensure that tasks were completed without Gulini having to be on top of him.  (Falero Dep. 26:10–22.)  Plaintiff cannot now argue that he, who was a part-time yard worker, and Falero, who was a full-time Assistant Manager, were similarly situated such that Gulini's requirement of a log from Plaintiff and not Falero creates an inference of racial animus.  Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013) ("Although the identification of a similarly situated individual outside of the protected class, who engaged in the same conduct but was treated more favorably, may give rise to an inference of unlawful discrimination, an employee who holds a different job in a different department is not similarly situated.").

As to Gulini's unwillingness to train him, Plaintiff offers very little explanation of this argument other than that Gulini was half-hearted, would forget to train him, and was very "blase" towards Plaintiff.  (Kier Dep. 227:7–228:8.)  Plaintiff, however, fails to explain what type of training he was seeking, particularly given his position as a yard worker in charge of maintenance and cleaning, and whether he ever asked Gulini for training during the month and a half they worked together.  Nor does he offer any facts to suggest that Gulini's general "blase" attitude towards him was racially motivated.  As to Gulini being the only supervisor dissatisfied with his work, Plaintiff fails to establish that there was any other supervisor to whom Plaintiff answered.  Even Falero conceded that, although he thought that Plaintiff's work was acceptable, it was not up to him to decide and Gulini was entitled to his own opinions.  (Falero Dep. 23:2–16.)  In

16

short, nothing in that fact remotely evinces any racial animus.

Finally, Plaintiff argues that he can raise an inference of discrimination based on the timing of his dismissal pursuant to the Third Circuit's pronouncement that "the timing of events surrounding an employee's dismissal may raise an inference of discrimination." Josey v. John R. Hollingsworth Corp., 996 F.2d 632, 640 (3d Cir. 1993).  Plaintiff then references the fact that his interaction with the customer occurred three weeks before his dismissal, but his complaint about the treatment of the African-American customer occurred only one week prior to his termination. Plaintiff's argument, however, conflates his retaliation claim with his racial discrimination claim. While the timing of termination could potentially suggest that it was as a result of his complaint about discrimination against a customer and, thus, constituted retaliation, it does not create any inference that his dismissal was related to Gulini's desire to discriminate against Plaintiff *because of Plaintiff's race.*

In sum, Plaintiff has simply not put forth any evidence, beyond mere speculation, that he was terminated due to some racial animus on the part of Gulini.  While the prima facie case is typically not an onerous burden, it is also not a meaningless standard that can be satisfied by unfounded suspicions of discrimination.  Accordingly, the Court dismisses Plaintiff's discrimination claim on this ground.

### 2.    Legitimate Non-Discriminatory Reason and Pretext

Even assuming *arguendo*, that Plaintiff could establish a prima facie case, his claim of disparate treatment founders at the second and third steps of the McDonnell Douglas analysis. As noted above, once a plaintiff sets forth a prima facie case of discrimination, the burden shifts to the employer to set forth a legitimate non-discriminatory reason for the challenged adverse

employment actions.  All the employer needs to do at this juncture is introduce admissible evidence that, if taken as true, would "*permit* a finding that the challenged employment action was taken for legitimate, nondiscriminatory reasons."  <u>Mitchell</u>, 884 F. Supp. 2d at 370 (emphasis in original).

Defendant, in this case, has done so.  According to the undisputed facts, on February 23, 2014, Plaintiff got into a heated verbal altercation with a customer, wherein he called him a "f***ing drunk" and told him to "go f*** himself."  In addition, the facts are undisputed that in March 2013, Gulini discovered a customer review on the U-Haul website written by another customer that was present during the time of the verbal altercation.  The review indicated that (1) Plaintiff had used profanity and called a customer a drunk, and (2) remarked that the reviewer would never do business with U-Haul again.  Gulini contacted Operations Manager Manny Zamora about this review, after which Zamora investigated the incident by speaking with Falero and Gulini in the King of Prussia location, consulting with someone in Human Resources, and ultimately coming to the conclusion that such outrageous conduct warranted termination.  This decision was based in part on the Lackland Self Storage Employee Handbook, which states that "[w]hile engaging in Lackland business, all employees are expected to conduct themselves in a professional manner.  This includes being courteous and respectful to everyone the employee comes into contact with, including clients, vendors, and colleagues." (Defs.' Mot. Summ. J., Ex. J.)  Accordingly, such events certainly establish a legitimate non-discriminatory reason for Plaintiff's termination.

The burden now shifts to Plaintiff to demonstrate that these reasons are nothing more than pretext.  As noted above, in order to establish that the defendant is liable for illegal employment

discrimination, the plaintiff must ultimately convince the trier of fact that a discriminatory animus was the real reason for the adverse employment action at issue. <u>Fuentes</u>, 32 F.3d at 765. "Liability cannot be established upon a jury's mere *disbelief* of the defendant's proffered reasons for an adverse employment action, but rather upon the jury's *affirmative belief* of the plaintiff's contention that the action was taken on the basis of an impermissible discriminatory criterion." <u>Mitchell</u>, 884 F. Supp. 2d at 370 (emphasis in original)). A plaintiff alleging employment discrimination on the basis of race or gender can show pretext in one of two ways: "the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Fuentes</u>, 32 F.3d at 764. Under the law of this Circuit, it is incumbent upon Plaintiff to point to evidence which demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworhty of credence." <u>Fuentes</u>, 32 F.3d at 765.

Plaintiff argues that Defendant's proffered reason for the termination is clearly pretextual because Defendant did not terminate Plaintiff until nearly three weeks after the customer interaction even though Gulini received notice of the events the same day that it occurred. In the intervening period, Plaintiff complained to Gulini that he was mistreating a customer based upon his race, leaving a factfinder free to decide that Defendant's termination of Plaintiff based on the earlier dispute was pretextual. Moreover, Plaintiff argues that U-Haul never had any communications with Defendants regarding the customer who complained about Plaintiff and

19

there were no adverse consequences to Defendants as a result.  Taking all the facts and inferences

therefrom in the light most favorable to the party opposing summary judgment, Plaintiff contends

that a genuine issue of material fact exists as to pretext and that summary judgment must be

denied.

This argument, however, is flawed on multiple grounds.  Primarily, by all accounts Gulini

did not know of the severity of the incident between Plaintiff and the customer until he read the

online review.  Gulini testified as follows:

> Q.    Can you please explain what was the difference, or if there was any
> difference, between what you learned from Jose Falero the night of the
> incident with the customer, that is, February 23rd, 2013, and what you learned
> three weeks later on March 12th, 2013?
>
> . . .
>
> A.    So I remember getting a voicemail from Jose in regards to an incident that
> had occurred between Keith and a customer.  But I didn't realize and I wasn't
> led to believe of the severity of the incident until I found the customer
> complaint on the U-Haul website and I investigated further and asked Jose to
> write a statement in regards to it.  That's when I realized the severity of the
> incident.
>
> Q.    Okay.  And, when you say "the severity of the incident," what is it—was
> there additional information you learned in March—on March 12th or
> thereabouts?
>
> A.    The language, swearing and profanity and the verbal abuse, by Keith to a
> customer.
>
> Q.    Okay.  When Jose first communicated to you about the incident, whether by
> voicemail or by text message, did he advise you that Mr. Kier had used
> profanity?
>
> A.    No, he did not, at that time.
>
> Q.    And, when he first reported the incident, did he advise you that Mr. Kier had
> called the customer a drunk?
>
> A.    No.  I did not know at that time.
>
> Q.    And when—
>
> A.    We're talking about for the voicemail, right, when I first found out about it?
>
> Q.    Yes.  When Mr. Falero—
>
> A.    No, I did not know.
>
> Q.    Okay.  When Mr. Falero first learned about the incident, did you know that
> Mr. Kier verbally abused the customer?

| | |
|---|---|
| A. | No, I did not. |
| Q. | When you first learned about the incident from Mr. Falero, did you speak with Mr. Kier about it? |
| A. | When I first learned about it? |
| Q. | After Jose's either voicemail message or text, did you then speak with Mr. Kier about the incident? |
| A. | No, not at the time. I didn't feel a need to at that time. |
| Q. | Okay. And did you speak with Jose about the incident? |
| A. | Not at that time. I got the voicemail and that was it. |

(Gulini Dep. 61:12–63:17.)

| | |
|---|---|
| Q. | So you had information that there was an altercation, which you didn't, according to you, know all the facts yet; correct? |
| A. | Correct. |
| Q. | And all of those other performance deficiencies we just talked about, but you still weren't going to terminate Keith correct? |
| A. | No. |
| Q. | No, that's not correct or, yes, I am correct, you were going to terminate Keith? |
| A. | No. I was not going to terminate him. I didn't have any plans to. |
| Q. | And then what changed for you? What, if anything, changed for you? |
| A. | I was reviewing the U-Haul website customer reviews. That's a big source of, you know, our business and continued business. And that's when I realized the severity of it. At that point, I brought it to Jose's attention. And I asked him to write a full statement in regards to exactly what had happened. |

(Id. at 34:3–23.)

Falero, while initially uncertain about what he relayed to Gulini on the night of the

incident, ultimately could not recall initially telling Gulini that Plaintiff had used profanity with

the customer:

| | |
|---|---|
| Q. | Did you immediately report the incident to Mr. Gulini? |
| A. | Over the phone, yes. |
| . . . | |
| Q. | Did you immediately approach Mr. Gulini that Mr. Kier told Mr. Hanley to go f*** himself? |
| A. | On the phone, yes. |
| Q. | And when I say "immediately," I'm talking about— |
| A. | Not immediately that second. After I closed the office, that's when I |

21

contacted him.

Q.  That same day?

A.  That same night.

. . .

Q.  Did you tell Mr. Gulini on the evening of 2/23/13 that Mr. Kier told Mr. Hanley to go f*** himself?

A.  I said they had an—there was an altercation between Mr. Hanley and Mr. Keith that night.

Q.  So, yes, you told him to go f*** himself or no, you did not tell him to go f*** himself?

. . .

A.  Basically, I'm explaining that I called my supervisor, Bill, to explain to him what occurred that night and that there was an incident and the yelling between Mr. Hanley and Keith and I don't believe and I can't recall and I can't explain what I said that night as far as oh, yes, exactly you told him to go f*** himself. But yes, I did call my supervisor to explain to him what occurred that night.

Q.  So the answer is no, you don't recall if you told Mr. Gulini if Mr. Kier used the F word?

A.  I don't recall that.

Q.  Do you recall explaining to Mr. Gulini as much facts as you could recall about the incident that evening?

A.  No. I just summarized it as there was an incident between, you know, like a yelling altercation between Keith and Mr. Hanley.

Q.  Considering that there was an incident which you deemed warranted immediate termination, wouldn't you provide your immediate supervisor with as much descriptive evidence as possible?

. . .

A.  I didn't believe it was that serious. I didn't think it was that serious as far as the yelling match, but I did provide the information because the customer did say that they wanted to contact customer service, so I gave them that information. And I believe that the gentleman behind him, who was the U-Haul customer, Green, he wanted to put a complaint as well.

(Falero Dep. 26:20–31:1.)[2] Given such testimony, there is no basis on which a reasonable

factfinder could determine that Gulini knew of the severity of the incident prior to discovering

---

[2] Plaintiff attempts to argue that Falero changed his story, first saying that he told Gulini about the profanity immediately and then denying that did so. A review of the testimony reveals, however, that Falero was initially unsure of what he told Gulini, but then clarified his testimony to indicate that he only summarized the events and did not recall telling Gulini about Plaintiff's use of profanity.

the customer review posted online.

Second, even if Gulini knew that Plaintiff used some profanity, the facts clearly show that a primary motivation for termination was, in fact, the actual customer review and the consequences it could have for the business.  Gulini testified that, shortly after he started, he began to periodically check the U-Haul website for reviews and, by coincidence, he checked on March 12, 2013, when the negative review was posted.  (Gulini Dep. 37:16–38:16.)  Gulini then explained that Plaintiff was terminated because of this complaint, indicating as follows:

> Q. What was it about this complaint—strike that.  Did you terminate Mr. Kier because of this complaint—
> A. Yes.
> Q. —or something else?
> A. Because of this complaint.
> Q. Any other reason why you terminated him?
> A. No.
> . . .
> Q. What was it about the complaint that made you decide to terminate Mr. Kier?
> A. Well, the customer specifically said that he used profanity towards the customer and that he used the specifics [sic] words, "F*** you.  You're a drunk."
> Q. Okay.  And, in your mind, does profanity warrant immediate termination towards a customer?
> A. Yes.

(Id. at 39:15–40:9.)  Thus, even if Gulini could have—under some version of the facts—be deemed to have known immediately about Plaintiff's use of profanity with the customer, the fact that Gulini was not prompted to contact his supervisor regarding Plaintiff's behavior until reading the customer review is not suggestive of pretext.  Rather, it indicates only that this became a situation that could no longer be handled internally among the three employees at the

King of Prussia location since it had now been made public.[3]

Third, Manny Zamora testified that ultimately he, not Gulini, made the decision to terminate Plaintiff and it is undisputed that Zamora did not learn of the incident until Gulini contacted him after finding the review. (Id. at 23:17–28:6.) Zamora then spoke with Human Resources and, based on his conversation with them, decided to write Plaintiff up and terminate his employment. (Zamora Dep. 33:11–34:8.) According to Zamora, neither Gulini nor Falero offered any opinion as to whether Plaintiff should be terminated. (Id. at 34:9–35:3.)

Finally, Plaintiff's effort to claim pretext due to his racial discrimination complaint is unsupported. Without any recollection of specific dates or times, Plaintiff testified that approximately one week prior to his termination, he accused Gulini of treating a *customer* unfairly because he was black. Notably, neither Gulini nor Falero, who was allegedly also present for the discussion, could recall any such incident. Moreover, Plaintiff's attempt to interject a racial discrimination claim into the brief period between the customer interaction at issue and his termination does not undermine the legitimacy of his termination due to his use of profanity with a customer and a subsequent online review. Nor does it create any inference that Plaintiff was terminated because he himself is African-American. In other words, this purported complaint by Plaintiff would not allow a jury to either disbelieve that Plaintiff was terminated for his use of profanity, or to affirmatively believe that race—as opposed to complaints of racial discrimination—was the true motivating factor for his termination.

In short, Plaintiff has not met his burden of proving pretext. Nothing in the testimony

---

[3] As noted above, Zamora explained that reviews and customers are important, especially at this store that was struggling, and a review like that could have hurt the store "big time." (Zamora Dep. 39:13–23.)

offered by Defendant's multiple witnesses suffers from any weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions.  Likewise, the evidence does not allow even an inference that race was more likely than not a motivating or determinative cause of Defendants' action.  Rather, the witnesses all uniformly testified that, within a span of three weeks, Plaintiff had a profanity-laced interaction with a customer; Gulini was made aware of the fact that some type of altercation had occurred; Gulini discovered a customer review on the U-Haul website that described this altercation in detail; Gulini brought this review to the attention of his supervisor, Manny Zamora; Zamora raised the issue with Human Resources; and Zamora and Human Resources made the joint determination to terminate Plaintiff.  Nothing in the record before the Court casts doubt on this legitimate, non-discriminatory reason for termination.

### B.    Retaliation Claim

Title VII's anti-retaliation provision declares it to be an "unlawful employment practice" for a covered employer "to discriminate against" an employee "because he [or she] has opposed any practice made an unlawful employment practice" by Title VII, or "because he [or she] has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" thereunder. 42 U.S.C. § 2000e–3(a).  "To establish a prima facie case of retaliation under Title VII, a plaintiff must tender evidence that: '(1) she engaged in activity protected by Title VII; (2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action.'" Moore v. City of Phila., 461 F.3d 331, 340–41 (3d Cir. 2006) (quoting Nelson v. Upsala Coll., 51 F.3d 383, 386 (3d Cir. 1995)).  Defendant now contends that Plaintiff's retaliation claim must fail because he did not engage in any "protected activity," he cannot

25

demonstrate causation, and he cannot show pretext.  The Court considers each argument separately.

### 1.   **Protected Activity**

"[T]he anti-retaliation provision of Title VII protects those who participate in certain Title VII proceedings (the 'participation clause') and those who oppose discrimination made unlawful by Title VII (the 'opposition clause')." Id. (citing Slagle v. Cnty. of Clarion, 435 F.3d 262, 266 (3d Cir. 2006)).  Protected activity may consist of "formal charges of discrimination as well as informal protests of discriminatory employment practices, including making complaints to management." Barber v. CSX Distrib. Servs., 68 F.3d 694, 702 (3d Cir. 1995) (internal quotations omitted).  In order to constitute protected activity, however, a complaint "must be specific enough to notify management of the particular type of discrimination at issue." Sanchez v. SunGard Availability Servs., LP, 362 F. App'x 283, 288 (3d Cir. 2010) (citing Barber, 68 F.3d at 702).  While all complaints or protests must be more than just general complaints of unfair treatment, Barber, 68 F.3d at 701–02, protection is not lost because an employee might be or is mistaken on the merits of his or her claim.  Slagle, 435 F.3d at 268 (holding that Title VII does not protect against retaliation for filing a claim that is facially invalid because it failed to allege any conduct that was prohibited by Title VII).  The Third Circuit has been clear that an employee has not engaged in protected opposition activity when he or she complains about unfair treatment, but stops short of referencing a protected characteristic as the basis for the unfair treatment.  See, e.g., Curay–Cramer v. Ursuline Acad. of Wilmington, DE, 450 F.3d 130, 134–35 (3d Cir. 2000); Barber, 68 F.3d at 701–02.

Defendants argue that Plaintiff did not engage in protected conduct when Plaintiff told

26

Gulini "you are getting all out of hand because this is a black guy, man," and "it wasn't right." (Kier Dep. 59:23–60:16.)  They assert that Plaintiff did not complain about an employment practice made unlawful by Title VII.  Rather, according to Defendants, this was nothing more than a general complaint of unfair treatment that did not pertain to any employment discrimination prohibited by Title VII.

Defendants' argument is inaccurate.  While true that a general complaint of unfair treatment does not establish protected activity under Title VII, Plaintiff's complaint to Gulini was far more than a "general" complaint.  Rather, Plaintiff specifically remarked that Gulini was treating a customer unfair because of his race.  In other words, Plaintiff was opposing a practice made unlawful by Title VII.  Simply because the complaint was an informal protest to management of a discriminatory employment practice as opposed to a more formal, written complaint to particular authority does not preclude it from being "protected activity" for purposes of Title VII.

### 2.    Causation

The third element of a prima facie case requires a showing of a causal connection between the Plaintiff's protected activity and an action that might have dissuaded a reasonable worker from making or supporting a charge of discrimination.  Moore, 461 F.3d at 341–42 (3d Cir. 2006).  To determine whether a plaintiff has met the causation element, the court must consider all evidence that is "potentially probative of causation."  Farrell v. Planters Lifesavers Co., 206 F.3d 271, 279 (3d Cir. 2000).  Generally, temporal proximity of a retaliatory act to a protected activity is probative, but not dispositive of the causation element.  Estate of Smith v. Marasco, 318 F.3d 497, 512–13 (3d Cir. 2003).  Stated differently, temporal proximity between

the protected activity and the employer action may indicate causation, but "'the mere fact that adverse employer action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events.'" Krouse v. Am. Sterilizer Co., 126 F.3d 494, 503 (3d Cir. 1997) (quoting Robinson v. City of Pittsburgh, 120 F.3d 1286 (3d Cir. 1997)). To be "unusually suggestive" of a retaliatory motive, "the temporal proximity must be immediate." Lorah v. Tetra Tech, Inc., 541 F. Supp. 2d 629, 636 (D. Del. 2009). The Third Circuit has suggested that a temporal proximity of two days is sufficient to establish causation, see Farrell, 206 F.3d at 279 & n.5, whereas a temporal proximity of ten days is sufficient to establish causation only when accompanied by other evidence of wrongdoing, Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 (3d Cir. 2003); see also Fischer v. Transue, No. Civ.A.04–2756, 2008 WL 3981521, at *10 (M.D. Pa. Aug. 22, 2008) (holding that temporal proximity of twenty-two days was insufficient to establish causation); Smith v. ABF Freight Sys., Inc., No. Civ.A.04–2231, 2007 WL 3231969, at *11 (M.D. Pa. Oct. 29, 2007) (holding that temporal proximity of one and one-half months was insufficient to establish causation); Mar v. City of McKeesport, No. Civ.A.05–19, 2007 WL 2769718, at *4 (W.D. Pa. Sept. 20, 2007) (holding that temporal proximity of three months was insufficient to establish causation); Killen v. N.W. Human Servs., Inc., No. Civ.A.06–4100, 2007 WL 2684541, at *8 (E.D. Pa. Sept. 7, 2007) (holding that temporal proximity of seventeen days was insufficient to establish causation). "This suggests that the temporal proximity must be measured in days, rather than in weeks or months, to suggest causation without corroborative evidence." Conklin v. Warrington Twp., No. Civ.A.06–2245, 2009 WL 1227950, at *3 (M.D. Pa. April 30, 2009). "[I]n cases where temporal proximity is not 'unusually suggestive' of retaliatory motive, the

28

Third Circuit has demanded further evidence to substantiate a causal connection." McCloud v. United Parcel Serv., Inc., 543 F. Supp. 2d 391, 401–02 (E.D. Pa. 2008). "Such other evidence may include, but is not limited to, a 'pattern of antagonism' by the employer that could link the adverse action with Plaintiff's complaint." Id. "Merely engaging in a protected activity prior to suffering an adverse employment action does not give rise to a harm cognizable as retaliation under Title VII or the ADEA." Barthold v. Briarleaf Nursing & Convalescent Ctr. Nursing Home, No. Civ.A.13-2463, 2014 WL 2921534, at *6 (E.D. Pa. June 27, 2014).

In this case, Plaintiff claims that he has created a genuine issue of material fact regarding causation by several means. First, he contends that an inference of retaliation exists when an employee is terminated shortly after engaging in protected activity. More specifically, Plaintiff was terminated approximately one week after objecting to Gulini's treatment of a customer based solely on that customer's race—a temporal proximity which he alleges is very suggestive of causation. Second, Plaintiff asserts that he has shown an intervening period of "antagonism" from the time he engaged in protected activity until the time he was terminated since, after he made his complaint to Gulini, "things were tight" and the way he was treated by Gulini "made [him] feel more uncomfortable even than before." (Gulini Dep. 80:11–18.)[4]

Plaintiff's causation claim, however, fails on several levels. First, Plaintiff concedes that he has no idea who made the decision to terminate him. (Kier Dep. 93:14–94:3.) The evidence of record, however, firmly establishes that it was not Gulini, but rather Zamora who made the decision to Plaintiff after receiving a communication from Gulini describing Plaintiff's

---

[4] Plaintiff also asserts that he can establish causation by showing that Defendants' proffered reasons for termination were not credible. The Court finds, however, that this argument is better addressed under the pretext section.

altercation with a customer.  Indeed, Zamora conducted his own investigation of the incident,

spoke with Falero outside of Gulini's presence, and reached out to Human Resources regarding

the appropriate action for such conduct before reaching the independent conclusion that Plaintiff

should be terminated.  Plaintiff points to no evidence that Zamora was privy to any discussion

regarding Plaintiff's comments to Gulini regarding racism, let alone that he was influenced by

any such event.  "It is only intuitive that for protected conduct to be a substantial or motiving

factor in a decision, the decisionmakers must be aware of the protected conduct."[5]  Ambrose v.

---

[5]  Plaintiff argues that the evidence is clear that both Gulini and Zamora were decision makers based on Defendants' responses to interrogatories.  The interrogatory cited by Plaintiff, however, only asked them to identify "each and every person who *participated* in the decision to terminate Plaintiff."  (Pl.'s Mot. Summ. J., Ex. F., Interrog. No. 3 (emphasis added).)  In response, Defendants indicated that both William Gulini and Manny Zamora participated in the decision to terminate Plaintiff's employment."  (Id. at Resp. to Interrog. No. 3.)  Merely because Gulini participated in the decision to terminate Plaintiff does not indicate that he was the ultimate decisionmaker.  Indeed, as described above, such an inference is contradicted by deposition testimony.

Plaintiff also argues that even if Zamora were the decision maker, Defendants would nevertheless be liable for discrimination against Plaintiff under the "Cat's Paw Theory," as described in Staub v. Proctor Hosp., 562 U.S. 411, 131 S. Ct. 1186 (2011).  In that case, the Supreme Court held that "if a supervisor performs an act motivated by . . . animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable . . ." Id. 131 S. Ct. 1194 (footnote omitted); see also Vogel v. Pittsburgh Pub. Sch. Dist., No. Civ.A.12-1250, 2014 WL 4187151, at *18 (W.D. Pa. Aug. 21, 2014) ("Where, as here, multiple individuals have input into an employment decision, liability may be established under a subordinate bias or 'cat's paw' theory of employment discrimination.  This kind of claim allows a plaintiff to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision.").

This principle offers no reprieve for Plaintiff in the present case.  As a primary matter, Plaintiff has adduced no evidence that Gulini acted with racial animus.  Moreover, Plaintiff fails to establish that Gulini influenced Zamora's decision to terminate Plaintiff.  Indeed, by all accounts, Gulini did nothing more than contact Zamora regarding the negative customer review.  Zamora then drove to King of Prussia to conduct his own investigation, spoke individually with Gulini and Falero, and contacted U-Haul's customer service consultant before reaching the ultimate conclusion to terminate Plaintiff.

Twp. of Robinson, Pa., 303 F.3d 488, 493 (3d Cir. 2002).

Second, even assuming that Gulini had some role in deciding to terminate Plaintiff, Plaintiff contradicts his own claims of antagonism by expressly admitting that Gulini never treated him with any disrespect after the communication where Plaintiff accused him of being racist. (Kier Dep. 95:8–11.) Absent some intervening antagonism, Plaintiff cannot rest solely on a temporal proximity of more than one week.

Third, Plaintiff disregards the principle that "a causal link between an employee's protected activity and an adverse employment action against that employee may be broken by intervening events." Outten v. Genesis Health Care, LLC, No. Civ.A.13-4708, 2014 WL 3964918, at *12 (E.D. Pa. Aug. 12, 2014). In this case, Gulini discovered the harsh customer review on U-Haul's website on March 12, 2013 and notified Zamora. Zamora conducted his investigation of the incident and made the decision to terminate Plaintiff on March 14, 2013—after Plaintiff's discrimination complaint to Gulini. Plaintiff offers no evidence to establish that his discussion with Gulini, which occurred over a week prior to his termination, was the motivating factor for his termination, rather than the discovery of a harsh customer complaint, which was discovered two days before his termination.

Finally, other than stating that he made a complaint about racism to Gulini and then was terminated over a week later, Plaintiff admits that he has no evidence to link the two incidents. Specifically, the following exchange occurred at Plaintiff's deposition:

> Q.    When Bill said to you I have to terminate you, did Bill tell you why he felt he had to terminate you?
> A.    Well, he said because of the incident.
> Q.    Did you ask him why do you have to terminate me, the guy apologized, the guy apologized to me?

31

A.     I felt it had nothing to do with it.

Q.     You felt his apology—

A.     I felt that the whole incident had nothing to do with me being terminated.

Q.     Okay. That's because why?

A.     Because of the previous incident with the other customer.

Q.     You thought that had to do with your termination?

A.     Definitely.

Q.     What are the facts on which you base that feeling, other than your just feeling, your gut feeling that it really had to do with the comment you made to Bill in which you accused him of racism a week earlier? That's what you were doing. Were you accusing Bill of racism, correct?

A.     Absolutely.

Q.     You feel that your termination was because of that and not the incident with the customer, correct?

A.     Yes.

Q.     Did Bill treat you with any disrespect after the communication you had with him about the customer when you accused him of being a racist?

A.     No.

(Kier Dep. 94:4–95:11.)

In short, other than a tenuous temporal proximity, Plaintiff offers no evidence to establish causation. Although he complained to Gulini about racism, Plaintiff fails to show that those complaints were ever communicated to Zamora, as the ultimate decisionmaker, that there was any intervening period of antagonism, or that his single complaint about racism, as opposed to the intervening event of the discovery of the on-line review about Plaintiff's altercation with a customer, was the but-for cause of his termination. It is well established that the mere existence of some evidence in support of the non-movant will not be adequate to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-movant on that issue. Anderson, 477 U.S. at 249–50. Given that no reasonable juror could find in Plaintiff's favor on the issue of causation, the Court must grant Defendant's Motion

for Summary Judgment on the retaliation claim.[6]

### 3. **Pretext**

Finally, even if Plaintiff could establish his prima facie case, his retaliation claim falls

apart at the pretext element. As set forth in detail above, Defendants offered a legitimate,

nondiscriminatory reason for their termination of Plaintiff—Plaintiff's altercation with a

customer wherein he called the customer a "f***ing drunk" and told the customer to "go f***

himself," followed by a customer review on a U-Haul website complaining about this altercation

and refusing to do business with U-Haul as a result. Plaintiff has put forth no evidence to create

any genuine issue of fact regarding pretext. Accordingly, Plaintiff's retaliation claim must be

dismissed on this ground as well.[7]

## IV. **CONCLUSION**

Having thoroughly considered all of the evidence presented by the parties, as well as the

parties' briefing, the Court finds that Plaintiff has not met his Rule 56 burden of showing a

genuine issue of material fact on the viability of his claims. The parties agree on the basic facts:

that Plaintiff had an inappropriate altercation with a customer; that his supervisor, Gulini, was

advised in some respect about this occurrence on the evening that it occurred; that three weeks

---

[6] Plaintiff acknowledges that the United States Supreme Court, in University of Southwest Medical Center v. Nassar, 133 S. Ct. 2517 (2013), eliminated a plaintiff's access to "mixed-motive" theories of discrimination. Plaintiff argues, however, that this holding did not modify the typical burden-shifting analysis and that plaintiffs may still demonstrate but-for causation through circumstantial evidence. This argument is inapposite as, even putting aside Defendants' legitimate motive for terminating Plaintiff, Plaintiff has still failed to come forward with any evidence showing that race was a but-for cause of his termination.

[7] Having dismissed both of Plaintiff's substantive claims, the Court need not address Plaintiff's joint employer theory.

later Gulini discovered a negative customer review on the U-Haul website regarding this occurrence; and that, based on that negative review and Plaintiff's use of vulgar language, he was terminated. Nothing in the record evinces any discriminatory animus on the part of either Gulini or Zamora. Moreover, even though Plaintiff claims to have accused Gulini of some racial discrimination against a customer a week or so prior to his termination, Plaintiff has not produced any direct or circumstantial evidence establishing that this accusation was a but-for cause for his termination. Finally, Plaintiff has not produced any evidence upon which a reasonable juror could disbelieve Defendant's legitimate, non-discriminatory reasons for terminating Plaintiff. Accordingly, the Court shall grant Defendants' Motion for Summary Judgment in its entirety.

An appropriate Order follows.

ENTERED

DEC 1 7 2014

CLERK OF COURT